Bartley, J.
To determine which of the parties in this case shall sustain the loss of the property in question occasioned by the accident, it becomes necessary to ascertain the true nature and character of the transaction between them, and the rights created and duties imposed thereby. It was either a contract of sale, a mutuum, or a deposit. If a contract of sale, the right of property passed to the purchaser on delivery, and the article was thereafter held by him at his own risk. If a mutuum, the absolute property passed to the mutuary, it being a delivery to him for consumption or appropriation to his own use; he being bound to restore not the same thing, but other things of the same kind. ■ Thus, it is held, that if corn, wine, money, or any other thing which is not intended to be delivered back, but only an equivalent in kind, be lost or destroyed by accident, it is the loss of the borrower or mutuary; for it is his property, inasmuch as he received it for his own consumption or use, on ■condition that he restore the equivalent in kind. And in this class ■of cases, the general rule is, ejus est periculum, cujus est dominium. Story on Bailments, sec. 283; Jones on Bailments, 64; 2 Ld. Baym. ■916. But if the transaction here was a deposit, the property remained in the bailor, and was held by the bailee at the risk of the bailor, so long as he observed the terms of the contract in so doing. But if the bailee shipped the wheat, and appropriated the same to his own use, in violation of the terms of the bailment, before the burning of his warehouse, he became liable to the bailor for the ■value of the property.
What then was the real character of the transaction between the parties ? The receipt I suppose to be in the ^ordinary form of warehouse receipts, and such as would be proper to be delivered by a warehouse depositary of wheat to the owner upon its being received into a warehouse for temporary safe-keeping, and to be re■delivered to the owner on demand. The obligation or contract which the law would imply as against the warehouseman on the face of such a receipt would be that he should use due diligence in ■the care of the property, and that he should re-deliver it to the *214 owner or to his order on demand, upon being paid a reasonable compensation for his services; and if the warehouseman, under such circumstances, should, without the consent of the owner, mix the wheat with other wheat belonging to himself or other persons, and ship the same to market for sale, he would be liable to the owner for the value of the wheat thus deposited with him.
The receipts themselves are silent as to the time the wheat was-to be kept, the price to be paid for its custody, when or how to be paid, whose property it was to be after delivery into the warehouse, and what disposition was to be made of it. But it is claimed that inasmuch as written receipts, whether for money or other property, are always subject to explanation by parol, that the terms on which this wheat was delivered can be explained by the declarations of the parties at the time of the delivery of the first load of wheat, and also by the custom of trade which prevailed among warehouse-men' at Milan ; and that by such explanation it is shown that the-real transaction was that the wheat was received, and, with the consent of the depositor, put in mass with other wheat of the warehouseman and that received of other persons, with the understanding that the wheat was to be at the disposal of the warehouseman, either to retain or ship it, and that when the receipts should be presented by the depositor, the warehouseman should either pay the market price therefor, or re-deliver the wheat, or deliver other wheat equal in amount and quality.
If these terms were incorporated into the contract, they could not have excused the liability of the warehouseman in this case. The distinction between an irregular deposit *or a mutuum and a sale is sometimes drawn with great nicety, but it is clearly marked, and has been settled by high authority. In case of a regular deposit, the bailee is bound to return the specific article deposited; but where the depositary is to return another article of the same kind and value, or has an option to return the specific article, or another of the same kind and value, it is an irregular deposit or mutuum, and passes the property as fully as a case of ordinary sale or exchange. Sir William Jones says: “ It maybe proper to mention the distinction between an obligation to restore the specific things, and a power or necessity of returning others of equal value. In the first case it is a regular bailment; in the second it becomes a debt.” In the latter case he considers the whole property transferred.
*215 Judge Story, in his commentaries on the law of bailment, says r “The distinction between the obligation to restore the specific-things, and the obligation to restore other things of the like kind and equal in value, holds in cases of hiring, as well as in cases of deposits and gratuitous loans. In the former cases, it is a regularbailment; in the latter, it becomes a debt or innominate contract. Thus, according to the famous laws of Alfenus, in the Digest, ‘if an ingot of silver is delivered to a silversmith to make an urn, the whole property is transferred, and the employee is only a creditor of metal equally valuable, which the workman engages to pay in a certain shape, unless it is agreed that the specific silver, and none-other, shall be wrought up in the urn.’ ” Story on Bailments, sec» 439.
In all this class of cases, the risk of loss by unavoidable accident attaches to the person who takes the control or dominion over the property. When, therefore, Washburn’s wheat was delivered to-Chase & Co., and became subject to their disposal, either to retain, or to ship it on their own account, the property passed, and the risk of loss by accident followed the dominion over it.
The doctrine here adopted was at one time somewhat obscured by the opinion of Chief Justice Spencer, in the case *of Seymours v. Brown, 19 Johns. 44, in which the court decided that where the plaintiff delivered wheat to the defendants, on the agreement •Rat for every five bushels of wheat the plaintiffs should deliver at the defendants’ mill, they, the defendants, would deliver in ex-«hange one barrel of flour, was a bailment, looatio opens faciendi ; ind the wheat having been consumed by fire, through accident, the defendants were not liable on their agreement to deliver the flour. This decision, however, was disapproved of by Chancellor Kent, as not being conformable to the true and settled doctrine laid down by Sir William Jones, who has been styled the great oracle of the law of bailment: 2 Kent’s Com. 464. And the decision has been distinctly overruled by repeated subsequent adjudications in the State of New York: Hurd v. West, 7 Cow. 752; Smith v. Clark, 21 Wend. 83; Norton v. Woodruff, 2 Comst. 153; Mallory v. Willis, 4 Comst. 77 ; and Pierce v. Skenck, 3 Hill, 28.
The same doctrine has been affirmed in the case of Baker v. Roberts, 8 Greenl. 101, and also Ewing v. French, 1 Blackf. 354. In the latter case, a quantity of wheat having been delivered by the plaintiff to the defendants, at their mill, to be exchanged for *216 flour, and the defendants having put the wheat into their common stock of wheat, the mill, with the wheat, was afterwards casually destroyed by fire. The court held that the defendants were liable for a refusal to deliver the flour. If in that case the agreement of the parties had been that the flour to be furnished should be the flour which should be manufactured from the specific wheat deliv ered, instead of an exchange of wheat for flour, it would have been a bailment, and the loss would have fallen upon the plaintiff.
In the case of Buffum v. Merry, 3 Mason, 478, where the plaintiff had delivered to the defendant cotton yarn on a contract to manufacture the same into cotton plaids, and the defendant was to find filling, and to weave so mány yards of plaids, at eighteen cents per yard, as was equal to the value of the yarn at sixty-five cents per pound, it was held to be a *sale of the yarn; and that, by the delivery of it to the defendant, it became his property, and he was responsible for the delivery of the plaid, notwithstanding the loss of the yarn by an accidental fire. But had the plaintiff and the defendant agreed to have the particular yarn, with filling to be found by the defendant, made into plaids on joint account, and the plaids, when woven, were to be divided according to their respective interests in the value of the materials, but, before the division, the plaids had been destroyed by accident, the loss, in the opinion of Judge Story, would have been mutual, each losing the materials furnished by himself.
The case of Slaughter v. Green, 1 Rand. 3, and also the case ol Inglebright v. Hammond, 19 Ohio, 337, are relied upon as sustaining the plaintiffs in error. These two cases, on examination, di> not sustain the doctrine of the case of Seymours v. Brown, abov« referred to in 19 Johns. On the contrary, instead of an exchango of wheat for flour, in each of the cases, by the express terms of the contract, the flour to be returned was to be manufactured out of the wheat furnished. In the former case, the written receipts given for the wheat expressly provided, “ that it is received to be ground,” which excludes the idea of passing the ownership to the miller. And in thelatter case it was also expressly provided by the agreement that the flour in controversy was “to be made out of the wheat furnished by Hammond’’ and “the flour made therefrom was to be delivered at Steubenville for said Hammond’s use.” In both these cases, therefore, the limitation in the agreement of the parties imported a bailment, and not an exchange for flour. And this character of *217 the transaction is not lost either because the custom of the country in reference to which the wheat was received warranted the mixing ■of it with the wheat of others, received on like terms; or because, by the express consent of the parties, the wheat was mixed with other wheat in the mill, belonging to the miller himself. When the owners of wheat consent to have their wheat, when delivered .at a mill or warehouse, mixed with a common mass, each becomes the owner *in common with others, of his respective share in the common stock. And this would not give the bailee any con■trol over the property which he would not have if the wheat of each one was kept separate and apart. If the wheat, thus thrown into a common mass, be delivered for the purpose of being converted into flour, each owner will be entitled to the flour manufactured from his proper quantity or proportion in the common stock. If a part of the wheat held in common belong to the bailee himself, he could not abstract from the common stock any more than his own appropriate share without a violation of the terms of the bailment; and such a breach of his engagement could not be cured by his procuring other wheat, to be delivered to supply the place ■of that thus wrongfully taken. But if the wheat be thrown into the common heap, with the understanding or agreement that the person receiving it may take from it at pleasure and appropriate ■the same to the use of himself or others, on the condition of his procuring other wheat to supply its place, the dominion over the property passes to the depositary, and the transaction is a sale and not a bailment.
It is claimed that the court of common pleas erred in refusing to ■charge the jury, as requested, “that the custom among warehouse-men at Milan, in the absence of an express contract, if known to Washburn, became a part of the contract.”
A custom, it is true, is not admissible, either to contradict or .alter the terms or legal import of a contract or to change the title to property by varying a general rule of law. But a custom, when fully established, becomes the law of the trade in reference to which it exists; and the presumption is that the parties intended to conform to it, when they have been silent on the subject. Its office is to interpret the otherwise indeterminate intentions of the parties, and to ascertain the nature and extent of their contract, arising not from express stipulations, but from mere implications ■and presumptions, and of acts of doubtful and equivocal charac *218 ter. I am not prepared to say that the customs at Milan, if *fully established, and known to both the parties to the contract for the delivery of wheat to a warehouseman, may not be regarded as law, as well as the customs of London or of Kent. Hut, unfortunately for the plaintiffs in error, the customs of Milan, as the evidence tended to prove, according to the bill of exceptions, very clearly showed the transaction between the parties in this case to be a contract of sale, and not a bailment. Had the court, therefore, charged as requested upon this point, it could not have aided the defense set up against the action. So that if the court did err in this particular, no injury was therefore done to the plaintiffs in error.

Judgment affirmed.